No. 02-772

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 175

_____

VICTOR and MARILYN HINKLE on behalf of
ROCKWELL HINKLE, a minor,

      Plaintiffs and Appellants,

   v.

SHEPHERD SCHOOL DISTRICT #37,
JIM BROWNING and JAMES "SHORTY" HORN,

      Defendants and Respondents.

_____

APPEAL FROM:    District Court of the Thirteenth Judicial District,
                  In and for the County of Yellowstone, Cause No. DV 99-0429
                  The Honorable Susan P. Watters, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

            Lee Rindal, Rindal Law Firm, Billings, Montana

      For Respondent:

            Marshall Mickelson, Corette Pohlman & Kebe, Butte, Montana

_____

                                  Submitted on Briefs:  May 22, 2003

                                     Decided:  July 1, 2004

Filed:

                 _____
                               Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1      Victor and Marilyn Hinkle, individually and on behalf of Rockwell "Rocky" Hinkle, ("Rocky" and "Hinkles"), appeal the District Court's Order granting summary judgment to Shepherd School District #37, Jim Browning, and James "Shorty" Horn ("Defendants"). While we agree the District Court erred in concluding that Defendants owed no duty to Hinkles, we affirm the summary judgment on the issue of causation.

## ISSUES

¶2      1. Did the District Court err when it granted Defendants' motion for summary judgment on the basis that no duty was owed to Hinkles because the alleged harm was not foreseeable?

¶3      2. Did the District Court err when it granted Defendants' motion for summary judgment on the basis that Hinkles' expert did not establish causation?

## FACTUAL AND PROCEDURAL BACKGROUND

¶4      Defendants stipulated that, for the purposes of their motion for summary judgment, they would rely upon the facts as testified to in the depositions of Rocky and his pediatrician Dr. Fred Gunville, which we relate here.  A freshman at Shepherd High School, Rocky traveled on the pep band bus to a basketball game in Belgrade on March 5, 1998.  After the game, the band ate dinner at Pizza Hut in Bozeman.  Rocky, along with his bandmates, band instructor Browning, and bus driver Horn, consumed pizza and soft drinks.

¶5      Some students requested a restroom stop during the return trip to Shepherd.  Rocky heard other students teasing those who had requested the restroom stop.  Horn pumped the

2

brakes to jar the bus and aid in teasing the students who needed to use the restrooms. Browning allowed Horn to stop the bus at a convenience store in Big Timber, where Rocky purchased a bottle of water which he drank on the bus. As the bus continued toward Shepherd, some students threw candy and cheese at other students. Rocky had candy and cheese thrown at him, but he did not otherwise participate.

¶6 A little while later, Rocky needed to relieve himself and asked Browning if the bus could stop so he could use a restroom. Browning did not respond. After a second inquiry, Browning refused. Rocky then asked a third time and Browning ignored him. At this point, the bus was approximately fifteen minutes away from Shepherd High School. The other students on the bus began to tease Rocky by making references to running water and waterfalls. At first, Rocky was not bothered by the mild teasing, but as the drive continued and Rocky's situation became more urgent, the teasing intensified, the food-throwers targeted Rocky, and more students participated in both. Rocky didn't recall ever specifically telling Browning that his need to use a restroom was an emergency, but he did ask other students for a bottle in which he could relieve himself.

¶7 Approximately one quarter-mile from Shepherd High School, Browning announced that no one could leave the bus before it was cleaned. The other students on the bus, aware of Rocky's situation, cheered. Rocky said, "You let me off this fucking bus." Browning asked Rocky what he said and Rocky repeated himself.

¶8 As the bus neared the school, Horn pumped the brakes again. As a result of the jarring movement of the bus, Rocky lost continence and wet himself. As soon as the bus

3

stopped at the school, Rocky rushed off the bus and into the boys' locker room. He used the restroom, returned to the bus to retrieve his belongings, and then left with his father, who was waiting at the school for him. The front of Rocky's jeans was noticeably wet, but he was not sure if any of the other students realized that he had had an accident.

¶9 The following day, Browning told Rocky that he would not be allowed to participate in the pep band for their next game, and that he might be removed from the band permanently for embarrassing Browning on the bus by using profanity. Rocky explained to Browning that he had been upset because of his need to use the restroom and because of the extent of the teasing by other students on the bus. Browning asked Rocky who had been teasing him and Rocky named seven students. Browning and Rocky then narrowed the list down to the three students whom Rocky asserted were the ringleaders.

¶10 The following Monday, Rocky was summoned to the principal's office and given a one-day out-of-school suspension for his use of profanity on the bus. After returning from his suspension on Wednesday, Rocky was again summoned to the principal's office and told that three students and a teacher had told the principal that Rocky was the instigator behind the antics on the bus. Rocky denied this, but the principal explained that he did not believe Rocky and ordered him to serve three days of lunch detention. Rocky was very upset and felt he was being treated unfairly.

¶11 Rocky claims that it was his discomfort, combined with the stress of being intensely teased by the other students on the bus, which caused him to be so upset that he used profanity on the bus. He argues that, although it was standard procedure for the band bus

4

to be emptied row by row with Browning checking each row to be sure it was clean before allowing its occupants to disembark, Browning had announced that no one could leave the bus in order to delay his exit. He believes the students and teacher lied about his involvement in the teasing on the bus, and that he was being punished repeatedly for a single incident over which he had no control.

¶12 On Friday, March 13, Rocky went to his brothers' residence after school and spent the weekend with them. They played video games, watched movies, and ate junk food. Throughout the weekend, Rocky did not feel well and experienced some vomiting. On Monday, his mother took him to his pediatrician. Dr. Gunville tested Rocky for strep throat and gave him a shot of penicillin.

¶13 Rocky's condition worsened and he revisited his pediatrician a few days later. He was ultimately diagnosed with ketoacidosis, a condition in which his body was not producing enough insulin, which in turn caused his blood to become dangerously acidic. Gravely ill, he was transported by air ambulance for advanced care in Denver, Colorado. He was in a life-threatening condition for several days before he began to recover. He now suffers from Type I diabetes and Post-Traumatic Stress Disorder (PTSD).

¶14 Rocky and his parents filed a lawsuit against Browning, Horn, and the Shepherd School District, alleging that various breaches of duty on their parts triggered or accelerated Rocky's development of diabetes and caused his PTSD. Rocky's parents also sought on their own behalf damages for emotional harm incurred by them due to the treatment Rocky received from Defendants and Rocky's subsequent medical condition.

5

¶15 In his deposition, Dr. Gunville stated that the added stress in Rocky's life could have contributed to the diabetic situation, and noted that Rocky's situation was very unusual in that he became extremely ill without having exhibited symptoms for very long. Dr. Gunville stated that Rocky's stress came both from school and from an upper respiratory infection. He admitted that, while Rocky would have eventually developed diabetes irrespective of the stress he was experiencing, stress likely accelerated its onset. Dr. Gunville could not differentiate between the physical stress from Rocky's infection and the emotional stress from the bus incident, or state whether one or the other or both were the stressors that accelerated Rocky's diabetes. He agreed that Rocky's experiences on the bus-- the thirst, the urgent need to relieve himself, the incontinence, and his reactiveness--were possibly symptoms of his emerging diabetic condition.

¶16 Defendants filed two motions for summary judgment. In their first motion, they claimed Hinkles failed to comport with the Montana Rules of Civil Procedure in regards to their disclosure of expert witnesses, that their experts should thus be excluded, and that Defendants were therefore entitled to judgment. The District Court denied this motion.

¶17 Defendants next moved for summary judgment on the grounds that they owed no duty to protect Rocky from injuries that were not foreseeable, and alternatively that his injuries were not caused by Defendants' actions. Oral argument on this motion was held in the District Court on January 31, 2002. On October 21, 2002, the District Court concluded that, even assuming *arguendo* that the chain of events stemming from the bus incident caused both the PTSD and the onset of Rocky's diabetes, such harm was unforeseeable by Defendants,

6

and thus they did not have a duty to protect Rocky from such harm. The District Court also concluded that Hinkles' expert failed to establish causation. The District Court therefore granted summary judgment in favor of Defendants. Hinkles timely appealed.

## STANDARD OF REVIEW

¶18 We review a district court's grant of summary judgment *de novo*, applying the same evaluation under Rule 56, M.R.Civ.P., as the district court. *Glacier Tennis Club at the Summit, LLC v. Treweek Constr. Co.,* 2004 MT 70, ¶ 21, 320 Mont. 351, ¶ 21, 87 P.3d 431, ¶ 21 (citations omitted). In other words, the party moving for summary judgment has the initial burden of proving that there are no genuine issues of material fact that would permit a non-moving party to succeed on the merits of the case, and if the moving party meets that burden, then the non-moving party must provide substantial evidence that raises a genuine issue of material fact in order to avoid summary judgment in favor of the moving party. *Glacier*, ¶ 21 (citations omitted). Once it is established that no genuine issues of material fact exist, the district court must then determine whether the moving party is entitled to judgment as a matter of law, and this Court reviews that determination to determine whether the district court erred. *Glacier*, ¶ 21 (citations omitted).

## DISCUSSION

### ISSUE ONE

¶19 1. Did the District Court err when it granted Defendants' motion for summary judgment on the basis that no duty was owed to Hinkles because the alleged harm was not foreseeable?

¶20 Hinkles maintain the District Court erred when it concluded as a matter of law that Defendants owed Hinkles no duty because Rocky's injuries were not foreseeable. They claim that the question of whether injuries are foreseeable by a defendant is a question of fact for the jury, citing *Kolar v. Bergo* (1996), 280 Mont. 262, 929 P.2d 867. Hinkles argue that it is appropriate for a district court to grant summary judgment in a negligence action only if reasonable minds could reach but one conclusion. They insist that here, based on the stipulated facts, reasonable minds could differ as to whether it was foreseeable that Horn's intentional jarring of the bus could cause a student, known to be in need of a restroom, to lose continence and suffer extreme embarrassment and stress which could then lead to other health problems. They further argue that Browning breached his duty of care to Rocky by tolerating Horn's braking actions, failing to stop the teasing from the other students, and refusing to order Horn to stop the bus so that Rocky could relieve himself. Hinkles also claim that Shepherd School District breached its duty to adequately and reasonably interview, hire, train, manage and supervise its employees, and that it breached further duties by failing to protect Rocky, and by later allowing him to be blamed and punished for the incident on the bus.

¶21 Hinkles maintain that the situation on the bus, combined with the series of unfair punishments which Rocky received afterwards, caused Rocky to experience extreme stress which either triggered his development of diabetes, or at the very least accelerated and exacerbated its onset. They also cite these incidents as causing Rocky to develop PTSD, although it is unclear if Hinkles argue that the PTSD stemmed directly from the bus incident

and its aftermath independently of the diabetes, or if Rocky's diabetic condition caused the PTSD.

¶22 Defendants argue that Hinkles misunderstand the concept of foreseeability and, citing *Poole v. Poole*, 2000 MT 117, ¶ 19, 299 Mont. 435, ¶ 19, 1 P.3d 936, ¶ 19, assert that the analysis of whether a duty is owed is a question of law for the court. They argue in their brief on appeal that, without foreseeability, there is no duty, and Defendants could not have foreseen that,

> by not stopping to allow Rocky Hinkle to use the restroom fifteen minutes from school, when Rocky Hinkle did not indicate that it was an emergency situation; by not intervening while children teased each other on the bus related to falling and running water; and the pumping of the brakes by Shorty Horn, would lead to Rocky Hinkle using the 'F' word twice to his teacher, which would lead to punishment for Rocky Hinkle uttering the 'F' word in front of his teacher on two occasions, which punishment consisted of one out-of-school suspension and three in-school lunch detentions, could cause any injury to Rocky Hinkle, let alone diabetes, exacerbation of diabetes, or post-traumatic stress disorder.

¶23 Ordinarily, negligence actions involve questions of fact and are not susceptible to summary judgment. *Poole*, ¶ 14 (citation omitted). However, if a plaintiff fails to offer proof of any one of the elements of negligence (duty, breach, causation, and damages), then summary judgment in favor of the defendant is proper. *Singleton v. L.P. Anderson Supply Co., Inc.* (1997), 284 Mont. 40, 44, 943 P.2d 968, 970 (citations omitted).

¶24 In the case at hand, the Defendants as the moving parties stipulated that, for purposes of the summary judgment motion, they would accept as true the facts as testified to in the depositions of Rocky and Dr. Gunville. While Hinkles have also referred to some testimony

from Horn's deposition, and appear to rely on the depositions of Victor and/or Marilyn Hinkle to establish their claim for damages, we refuse to consider such references because these depositions were never published and are therefore not a part of the record on appeal. We take this opportunity to remind parties that we cannot consider the contents of documents which were not submitted to the District Court and delivered in turn to this Court as part of the record. In any event, because we affirm the District Court's entry of summary judgment, the cited evidence tending to suggest that Hinkles suffered damages is irrelevant.

¶25 The existence of a duty of care depends upon the foreseeability of the risk and upon a weighing of policy considerations for and against the imposition of liability. *Jacobs v. Laurel Volunteer Fire Dep't*, 2001 MT 98, ¶ 13, 305 Mont. 225, ¶ 13, 26 P.3d 730, ¶ 13. Foreseeability constitutes a limitation on the otherwise potentially infinite liability which would follow every alleged negligent act, and the law of torts holds a defendant liable only for injuries to others which, to the defendant at the time, were reasonably foreseeable. *Mang v. Eliasson* (1969), 153 Mont. 431, 437, 458 P.2d 777, 781. A defendant owes a duty with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous and hence negligent in the first instance. *Mang*, 153 Mont. at 437, 458 P.2d at 781. A judicial determination of duty involves various policy considerations, including the moral blame attributable to the defendant's conduct; the prevention of future harm; the extent of the burden placed on the defendant; the consequences to the public of imposing such a duty; and the availability of insurance for the risk involved. *Jacobs*, ¶ 18.

10

¶26 In its Order and Memorandum in this case, the District Court noted, "The fact that Defendants' acts may have been unprofessional, inappropriate or inconsiderate is not indicative of the foreseeability of the alleged harm." Assuming *arguendo* that Defendants' actions could have caused Rocky's diabetes and subsequent PTSD, we must determine whether or not Defendants could have foreseen that their treatment of Rocky would result in injuries.

¶27 We find Hinkles' reliance on *Kolar* to be misplaced. In *Kolar*, this Court reversed a grant of summary judgment for the defendant because material fact issues involving contributory negligence, causation, and the alleged negligence of multiple defendants were in dispute. *Kolar*, 280 Mont. at 267, 929 P.2d at 870. *Kolar* involved a practical joke gone awry, in which the target of the practical joke collided with a motorcyclist while rushing to rescue a child from a fictitious emergency. On appeal, we noted that there were several factual disputes at issue, including whether the party who played the practical joke knew that the intended target of the joke was drinking alcohol, or knew that he might respond to the fictitious emergency by attempting to drive to the child's aid. *Kolar*, 280 Mont. at 267, 929 P.2d at 870. Although we did address foreseeability in our *Kolar* Opinion, our holding was ultimately premised on the moving party's failure to demonstrate that no genuine issues of material fact existed. *Kolar*, 280 Mont. at 267, 929 P.2d at 870. Here, for purposes of summary judgment, the material facts are not in dispute. Thus, *Kolar* is inapposite.

¶28 The inapplicability of *Kolar* does not end our inquiry. The District Court found dispositive the fact that Rocky's PTSD and diabetes complications could not have been

foreseen by Defendants. In other words, Defendants had to have foreseen these particular injuries. Under the law, however, the *specific injury* need not be foreseeable. Rather, the question is whether the defendants could have foreseen that their conduct would result in injuries to the plaintiff.

¶29   We have previously addressed this question in cases involving foreseeability as an element of causation. In *LaCock v. 4B's Restaurants, Inc.* (1996), 277 Mont. 17, 919 P.2d 373, we addressed jury instructions given in a case involving an alleged intervening cause. We reversed for a new trial, concluding that the district court's failure to instruct the jury that the specific injury to the plaintiff need not have been foreseen, affected the plaintiff's substantial rights. We said that the jury should be instructed consistently with the provisions of § 27-1-317, MCA, which provides that the measure of damages for breach of an obligation not arising from contract "is the amount which will compensate for all the detriment proximately caused thereby, *whether it could have been anticipated or not.*" (Emphasis added.) We recently reaffirmed this principle in *Samson v. State*, 2003 MT 133, ¶ 26, 316 Mont. 90, ¶ 26, 69 P.3d 1154, ¶ 26, "confirming that in cases alleging an intervening cause, juries must be instructed that the specific injury to the plaintiff need not have been foreseen."

¶30   A review of our case law reveals that the issue of whether the specific injury must be foreseeable has usually been addressed in cases in which intervening causation has been at issue. *See, e.g., Lopez v. Great Falls Pre-Release Services, Inc.*, 1999 MT 199, 295 Mont. 416, 986 P.2d 1081. However, in *Lopez* we did address foreseeability in the duty context. We said:

12

> Put simply, in analyzing foreseeability in the duty context, we look to whether or not the injured party was within the scope of risk created by the alleged negligence of the tortfeasor--that is, was the injured party a foreseeable plaintiff?

*Lopez*, ¶ 28 (citations omitted). We can conceive of no reason why the rule regarding foreseeability of injury should be different in cases where foreseeability is an element of causation as opposed to an element of duty. We therefore reaffirm the principle that, in analyzing foreseeability, whether in the causation or duty context, the inquiry must be whether the defendant could have reasonably foreseen that his or her conduct could have resulted in an injury to the plaintiff. The particular resulting injury need not have been foreseeable.

¶31 Returning to the case before us, as noted above, the District Court concluded as a matter of law that Defendants owed no duty to Hinkles because Rocky's injuries were not foreseeable. This was a decision properly before the trial court for resolution. We have held that, "the existence of a legal duty is a matter of law to be determined in the first instance by the trial court." *LaTray v. City of Havre*, 2000 MT 119, ¶ 18, 299 Mont. 449, ¶ 18, 999 P.2d 1010, ¶ 18 (citing *Nautilus Ins. Co. v. First Nat'l Ins., Inc.* (1992), 254 Mont. 296, 299, 837 P.2d 409, 411.) Based upon the foregoing, we conclude that the District Court erred in determining no duty was owed because the court focused on the foreseeability of the particular injury as opposed to the foreseeability that Defendants' conduct could result in some injury to Rocky. However, we must still address the remaining question resolved on

13

summary judgment, which is whether Hinkles' expert satisfied the causation element of Hinkles' negligence claim.

## ISSUE TWO

¶32    2. Did the District Court err when it granted Defendants' motion for summary judgment on the basis that Hinkles' expert did not establish causation?

¶33    Even though a particular injury need not be foreseeable in the duty context, Hinkles still must prove the causation element of their negligence claim--i.e., that the claimed injury was caused by Defendants' conduct.  Hinkles argue that the District Court erred when it concluded that Hinkles' expert did not establish that Defendants' actions caused Rocky's injuries.  In its Order and Memorandum, the District Court indicated it was unable to determine from the pleadings the chain of causation upon which Hinkles relied.  We likewise are unable to determine if Hinkles allege that Defendants caused Rocky to develop diabetes, or simply that their conduct accelerated or exacerbated a nascent medical condition, and whether this occurred because of the initial bus incident or because of the series of events which followed the bus incident.  A further question is whether Hinkles allege that Rocky's PTSD resulted from the bus incident or the bus incident aftermath, or perhaps came about as a result of the stress he experienced from his traumatic and life-threatening bout of ketoacidosis, or from his having to deal with the stress of managing his diabetes, or some combination thereof.   Unfortunately for Hinkles, this difficulty in framing the causation paradigm pervades not only the pleadings in this case, but also the medical evidence.

14

¶34    In its Order and Memorandum, the District Court concluded that expert testimony would be required for Hinkles to establish a causal connection between the alleged negligence of Defendants and Rocky's injuries.  The District Court further concluded that, according to his deposition testimony, Dr. Gunville could not say that it was more likely than not that Rocky's ketoacidosis, Type I diabetes, or PTSD were a result of the actions of Defendants during the bus incident or its aftermath.

¶35    Hinkles' ability to establish causation hinges on the testimony of their expert witness Dr. Gunville.  Rule 702, M.R.Evid., provides, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."  We have held that expert testimony is required when the issue presented is sufficiently beyond the common experience of the trier of fact and the expert testimony will assist the trier of fact in determining the issue or understanding the evidence.  *Dayberry v. City of E. Helena*, 2003 MT 321, ¶ 17, 318 Mont. 301, ¶ 17, 80 P.3d 1218, ¶ 17.  Here, Hinkles do not dispute that the development of ketoacidosis, Type I diabetes, and PTSD is beyond the common experience and understanding of the trier of fact.

¶36    A medical expert's opinion is admissible if it is based on an opinion that it is "more likely than not" that the alleged wrongdoing caused the plaintiff's injury.  *Butler v. Domin*, 2000 MT 312, ¶ 13, 302 Mont. 452, ¶ 13, 15 P.3d 1189, ¶ 13 (citations omitted).  In *Butler*, we concluded that the district court correctly excluded the testimony of a medical expert who

testified in his deposition that a particular injection "could have" caused the plaintiff's injury. *Butler*, ¶ 15.

¶37 Hinkles point to a portion of Dr. Gunville's deposition, in which he testifies, "[I]f Rocky suffered emotional distress, I can--I would never say that it did not cause harm to him. If he suffered emotional distress, I would have to say, as certain as anyone could state, that it would definitely cause harm." In their brief, Hinkles argue, "Dr. Gunville will testify that the stress *could have* accelerated the onset of, or agitated, Rocky's medical condition and at least caused Rocky harm." (Emphasis added.)

¶38 Hinkles' own argument concedes that Dr. Gunville's testimony would be that the stress *could have* had *something* to do with Rocky's medical condition. It *could have* accelerated or agitated it. As we held in *Butler*, this does not meet the threshold of establishing that Defendants' actions more likely than not caused the injuries claimed. Hinkles argue that the jury should be given the opportunity to hear expert testimony from both sides and be allowed to weigh the credibility of that testimony and draw its own conclusions. However, in order to survive summary judgment, Hinkles must first present expert testimony that establishes a causal connection between Defendants' actions and Rocky's injuries. *Dayberry*, ¶ 17. We conclude they simply have not done so in this case.

¶39 Thus, we affirm the District Court's grant of summary judgment to Defendants on the grounds that Hinkles cannot prove the element of causation.

## CONCLUSION

16

¶40     For the foregoing reasons, the District Court's Order of summary judgment is affirmed.

/S/ PATRICIA O. COTTER

We Concur:
/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ JIM REGNIER
/S/ W. WILLIAM LEAPHART